IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

Civil Action No. 07-cv-0526-DME-DON:

SKULL VALLEY BAND OF GOSHUTE INDIANS,
and PRIVATE FUEL STORAGE,

        Plaintiffs,

v.

LAURA DANIEL DAVIS, Associate Deputy Secretary of the Interior, CHAD
CALVERT, Principal Deputy Assistant Secretary of the Interior for Land and
Minerals Management, UNITED STATES DEPARTMENT OF THE INTERIOR, C.
STEPHEN ALLRED, Assistant Secretary of the Interior for Land and Minerals
Management,

        Defendants.

---

## ORDER

---

     Plaintiffs, the Skull Valley Band of Goshute Indians ("Skull Valley Band")

and Private Fuel Storage, LLC ("PFS"), invoke the Administrative Procedure Act

("APA"), to obtain review of two decisions made by the Department of Interior

("DOI") 1) denying a right-of-way application submitted by PFS and

2) disapproving a lease between the Skull Valley Band and PFS.  Having

jurisdiction under 28 U.S.C. §§ 1331 and 1362,[1] the Court VACATES those

decisions and REMANDS the right-of-way application and Plaintiffs' lease to the

---

[1]The APA waives the United States' sovereign immunity for purposes of
this suit, which seeks injunctive rather than damages relief.  See 5 U.S.C.
§ 702; see also Normandy Apartments, Ltd. v. U.S. Dep't of Housing & Urban
Dev., 554 F.3d 1290, 1295 (10th Cir. 2009).

DOI for further consideration.

# I. BACKGROUND

## A.    Factual background

The administrative decisions at issue here stem from Plaintiffs'
controversial plan to store spent nuclear fuel ("SNF") on the Skull Valley Band's
reservation, located in Tooele County, Utah.[2]   SNF is a byproduct of nuclear
generation of power; "[b]ecause SNF remains radioactive for thousands of
years, long-term storage strategies are essential."  Skull Valley Band of Goshute
Indians v. Nielson, 376 F.3d 1223, 1227 (10th Cir. 2004).  Many commercial
reactor sites, however, were designed with minimal SNF storage because the
utilities operating these plants had originally planned to reprocess the SNF.  But
that has not occurred, due to the relative abundance of uranium in the United
States and the fear that plutonium created during reprocessing could be used
for nuclear weapons.  And, although the federal government agreed to take title
to the SNF from the commercial power companies generating it and to provide

---

[2]The Skull Valley Reservation is located fifty-eight miles, as the crow flies,
from the state capitol in Salt Lake City (seventy-five miles by road), and fifty
miles from Salt Lake International Airport.  Only 160 of the more than 18,000
acres comprising the reservation are irrigable; the rest is suitable only for
grazing.  The Skull Valley Band has no natural resources except for its land.
The reservation is surrounded by industrial uses, mostly involving hazardous
materials.  Nearby is the Army's Dugway Proving Ground, where the military
tests chemical and biological weapons, the Army's Deseret Chemical Depot, the
United States' only incinerator for nerve gas, the Tooele Army depot, and a
low-level nuclear waste disposal facility.  In addition, Hill Air Force Base is also
nearby, and much of the air space in this area is restricted as part of the Air
Force's Utah Test and Training Range ("UTTR").

for its permanent storage, that has not yet occurred.[3]  See id.

Plaintiff PFS is a Delaware limited liability company described as "a consortium of utility companies, which formed in order to seek temporary storage options for" SNF until the federal government begins accepting SNF for permanent storage.  Id. at 1227-28.  Currently, these companies store SNF at their reactor sites.  But that on-site storage is running out.  Without additional storage options, these power companies may be forced to shut down their reactors prematurely.  Additionally, these utilities cannot fully decommission a reactor, after permanently shutting it down, until the SNF at that site is removed.

To solve these storage problems, PFS, in 1996, entered into an agreement with the Skull Valley Band to lease approximately 820 acres of the Band's 18,000-acre reservation in order to build and operate an SNF storage facility.[4]  PFS' general plan, which has already been licensed by the Nuclear

---

[3]In 1977, the federal government announced that it would take title to commercial SNF.  To facilitate that, Congress, "[i]n 1982, . . . passed the Nuclear Waste Policy Act (NWPA), 42 U.S.C. §§ 10101-10270.  The NWPA require[d] the United States Department of Energy ["DOE"] to construct a permanent storage facility for the disposal of SNF" by January 31, 1998.  Skull Valley Band, 376 F.3d at 1227.  That has not yet occurred.  Pursuant to the NWPA, the DOE has, however, entered into contracts with public utilities agreeing to dispose of their SNF permanently.  In return, the utilities have been making annual payments to the DOE, based upon the amount of nuclear power each utility generates each year, to pay for the federal permanent storage facility.  Because the United States has not yet built a permanent repository, several utilities have successfully sued the government for breach of contract, winning damages for the utilities' cost of storing the SNF until the permanent repository is built.  See Yankee Atomic Elec. Co. v. United States, 536 F.3d 1268, 1271-72 (Fed. Cir. 2008).

[4]There are three versions of the lease: the original lease executed in
(continued...)

3

Regulatory Commission ("NRC"), is to place the SNF, while it is still at the reactor sites, into sealed steel canisters that will then be encased inside NRC-certified steel shipping casks.  These 150-ton shipping casks would then be loaded onto specially designed rail cars and shipped to the Skull Valley storage site on commercial rail lines using trains dedicated only to transporting SNF.

The commercial rail line closest to the Skull Valley reservation runs parallel to Interstate 80 and is approximately twenty-four miles to the north of the site of the planned storage facility.  Therefore, PFS intends to build an "intermodal transport facility" ("ITF") on federally-controlled land located between that commercial rail line and the interstate.  At the ITF, PFS plans to use a crane to remove the 150-ton shipping casks containing the SNF from the rail cars and place those casks on "heavy haul" trucks that will then transport the casks the final twenty-four miles to the storage facility.

These heavy-haul trucks will do so using the existing two-lane Skull Valley Road.  The trucks can travel no more than twenty miles per hour, while the posted speed limit on Skull Valley Road is fifty-five miles per hour.  Each trip from the ITF to the storage facility by heavy-haul truck would take approximately 1.5 hours and would occur only during daylight.  On each trip, these 150- to

---

[4](...continued)
December 1996; an amended lease, executed in May 1997, which the Bureau of Indian Affairs ("BIA") conditionally approved a few days later; and a second amended lease, executed in January 2002, which incorporated all of the mitigation requirements set forth in the final environmental impact statement ("FEIS").  It is that second amended lease that is at issue here.

180-foot-long trucks would be accompanied by two escort vehicles, one

travelling 1,000 feet in front of the truck, and the other 1,000 feet behind it.  PFS

estimates that one to two trains will arrive at the ITF weekly, with each train

carrying two to three shipping casks.  PFS further estimates that a heavy-haul

truck would need to make between two and four round trips per week, or

between 100 and 200 round trips annually.[5]

Once at the storage facility, PFS will remove the canisters containing the

SNF from the shipping casks and place those canisters inside storage casks,

which will be steel-lined, filled with concrete and weigh approximately 180 tons.

The twenty-foot-high storage casks will then be placed on cement pads and

cooled in the open air.

---

[5]In addition to applying for a right-of-way to build and operate the ITF, PFS also applied, alternatively, for a right-of-way to build instead a rail spur that would have run directly from the commercial rail line to the storage facility.  PFS would have preferred to transport the SNF to the storage facility using this rail spur because then the SNF could remain on the same trains for the entire journey to the storage facility.  Not only would this have been logistically easier, but it would have exposed PFS' workers to less radiation than using the ITF and would not have involved transporting SNF using slow-moving heavy-haul trucks travelling on a public road.  Congress nixed the possibility of this rail spur, however, when it designated the area over which the rail spur would have run as wilderness area, through which no right-of-way could be granted, see 43 C.F.R. § 2801.6(b)(3) (noting that, with limited exceptions, BLM regulations authorizing rights-of-way across federal land do not apply to designated wilderness areas). PFS then turned to its alternative plan to build the ITF and use the heavy-haul trucks to complete transporting the SNF to the storage site.  The final environmental impact statement ("FEIS") indicated that, although the ITF transportation option would expose PFS' workers to more radiation than using the proposed rail spur, the doses of radiation could, nevertheless, be managed to remain within acceptable limits.  Further, although the ITF transportation option would disrupt traffic on Skull Valley Road, the FEIS determined that the disruption would be "small," which the FEIS defined as not detectable or so minor that it would not destabilize or noticeably affect the resource.

The NRC licensed PFS to store a total of 40,000 metric tons (44,000 tons) of SNF at the Skull Valley facility.  Because each cannister will hold ten metric tons of SNF, the facility will contain up to 4,000 storage casks, each encapsulating a cannister of SNF.  PFS intends to accept for storage SNF from its own members, as well as from other utilities.

Plaintiffs' lease runs for twenty-five years, with an irrevocable option for an additional twenty-five-year term.  The NRC has licensed the storage facility for twenty years; that license can be renewed for an additional twenty years.[6] See 10 C.F.R. § 72.42.

When the NRC license expires and the lease ends, PFS must decommission the facility.  This will involve removing all SNF, as well as the shipping and storage casks and, at the Band's request, any buildings and the cements pads, too.  The NRC license includes provisions to insure that PFS has and will maintain the economic wherewithal to complete this decommissioning.

At the time they entered into this lease, Plaintiffs expected that, by the time the NRC license expired and the lease ended, the DOE will have begun operating a permanent storage facility that would then accept the SNF that had been stored temporarily at Skull Valley.  But even without the existence of such a permanent storage facility, the lease obligates PFS to remove all of the SNF from the Skull Valley facility when the NRC license expires and the lease runs

---

[6]There is apparently some disagreement on the extent to which the NRC license can be renewed, but that is not a critical fact to the determination of the issues currently before this court.

out.  PFS intends to fulfill this obligation through its contracts with the utilities which will be storing their SNF at the Skull Valley facility.  Those utilities will continue to own the SNF, even while it is stored at the Skull Valley facility, and they will be contractually obligated to remove their SNF from the Skull Valley site when PFS' NRC license expires, regardless of whether or not there is a DOE-operated permanent storage facility available.

## B.    Administrative proceedings

In order to begin operating this storage facility on the Skull Valley Band's reservation, Plaintiffs had to obtain the approval of several federal administrative agencies.  PFS, therefore, applied for a license from the NRC to operate the storage facility, and for a right-of-way from the Bureau of Land Management ("BLM"), a bureau within the DOI, on which to build and operate its ITF.  Further, because the Skull Valley Band is a federally recognized Indian tribe, see 61 Fed. Reg. 58211-02 (Nov. 13, 1996), and the United States holds its land in trust, Plaintiffs had to obtain the approval of their lease agreement from the Bureau of Indian Affairs ("BIA"), another bureau within the DOI.

In considering Plaintiffs' requested administrative actions, each of these agencies first had to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370f ("NEPA").  Briefly stated, NEPA requires a federal agency, "before undertaking 'major Federal actions significantly affecting the quality of the human environment,'" to evaluate and disclose the potential environmental impacts of that proposed action.  Forest Guardians v. U.S. Forest Serv., 495 F.3d 1162, 1172 (10th Cir. 2007) (quoting 42 U.S.C. § 4332(2)(C)).

This requirement serves "twin aims": "First, NEPA forces government agencies to consider every significant aspect of the environmental impact of a proposed action. Second, NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts." Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv., 297 F.3d 1012, 1021 (10th Cir. 2002) (quotations, citations omitted). NEPA imposes procedural, rather than substantive, requirements, however; it "does not mandate particular results." Lee v. U.S. Air Force, 354 F.3d 1229, 1237 (10th Cir. 2004) (quotation omitted). Nor does it "require agencies to elevate environmental concerns over other appropriate considerations; it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action. In other words, it prohibits uninformed–rather than unwise–agency action." Citizens' Comm. to Save Our Canyons v. Kreuger, 513 F.3d 1169, 1178 (10th Cir. 2008) ("Kreuger") (quotation, alteration omitted). Where, as here, "the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor." Fuel Safe Washington v. FERC, 389 F.3d 1313, 1324 (10th Cir. 2004) (quotation omitted).

In this case, the administrative agencies involved in the PFS/Skull Valley project chose to comply with NEPA by acting together. The NRC took the lead, with the BIA and BLM acting as cooperating agencies, in preparing a draft environmental impact statement ("DEIS"), seeking public comment on that

8

document, and then issuing a final environmental impact statement ("FEIS").

See 40 C.F.R. §§ 1501.5, 1501.6.  The FEIS these agencies prepared

recommended going forward with the PFS/Skull Valley project, but preferring the

use of the rail spur, rather than the ITF, to transport the SNF to the storage

facility.

Following completion of the FEIS, the NRC issued PFS a license to

operate the storage facility.[7]  Upper level DOI officials then assumed control of

PFS' right-of-way application from the BLM and denied that application, after

concluding that to grant the application would be against the public interest

because there still remained too many unanswered questions about the project.

Upper level DOI officials also took over Plaintiffs' lease approval request from

the BIA and disapproved the lease for a number of reasons, including the need

to protect the reservation for future generations of the Skull Valley Band.[8]

Plaintiffs now invoke the APA to obtain judicial review of these two decisions.[9]

---

[7]The NRC's decision to issue PFS a license is being challenged in litigation in the D.C. Circuit.  That action has been stayed, however, pending a decision in this case.  See Ohngo Gaudadeh Devia v. NRC, 492 F.3d 421, 422 (D.C. Cir. 2007).

[8]Ordinarily the BIA and the BLM would make the initial decisions on these requests, and then that decision could be administratively appealed.  But here, upper level DOI officials made the initial decision, which represented the agency's final, and thus appealable, determination.

[9]In addition to the DOI, Plaintiffs also originally named as defendants the individual DOI officials who issued these decisions, James E. Cason, Associate Deputy Secretary of the Interior, and Chad Calvert, Acting Assistant Secretary of the Interior for Land and Mineral Management.  In their amended complaint, Plaintiffs added a new assistant secretary for land and mineral management, C.

(continued...)

<u>See</u> 5 U.S.C. § 702.

## II.  STANDARD OF REVIEW

Under the APA, "[t]he reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  5 U.S.C. § 706(2)(A); <u>see also</u> <u>TMJ Implants, Inc. v. U.S. Dep't of Health & Human Servs.</u>, 584 F.3d 1290, 1299 (10th Cir. 2009).  A court will also "set aside an agency's action if the agency has failed to follow required procedures."  <u>Krueger</u>, 513 F.3d at 1176.

A court's review under the APA is "highly deferential," <u>id.</u> (quotation omitted); and the reviewing court may not substitute its judgment for that of the agency, <u>see</u> <u>United Keetoowah Band of Cherokee Indians v. U.S. Dep't of Housing & Urban Dev.</u>, 567 F.3d 1235, 1239 (10th Cir. 2009).  Nevertheless, the court is still "required 'to engage in a substantial inquiry' and to conduct a 'thorough, probing, in-depth review.'"  <u>Id.</u> (quoting <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415 (1971), <u>abrogated on other grounds by</u> <u>Califano v. Sanders</u>, 430 U.S. 99, 105 (1977)).  While administrative agencies'

---

[9](...continued)

Stephen Allred.  And Defendants, in the caption of their pleadings, have now substituted Laura Davis for Cason.  <u>See</u> Fed. R. Civ. P. 25(d) providing that, "when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending[,] [t]he officer's successor is automatically substituted as a party").  Because the substitution is "automatic," the caption has been changed to reflect the caption as it appears on Defendants' latest briefs.

10

decisions are afforded a presumption of validity,[10] a decision will nonetheless be

> arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  Furthermore, [the reviewing court] must determine whether the disputed [agency] decision was based on consideration of the relevant factors and whether there has been a clear error of judgment.

Morris v. U.S. NRC, 598 F.3d 677, 690-91 (10th Cir. 2010) (quotation omitted).

"Because the arbitrary and capricious standard [of review] focuses on the rationality of an agency's decision making process rather than the rationality of the actual decision, it is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  Colo. Wild v. U.S. Forest Serv., 435 F.3d 1204, 1213 (10th Cir. 2006) (quotation, alteration omitted).

Plaintiffs bear the burden of establishing that the agency's action is invalid.[11]  See Sorenson Commc'ns, Inc. v. FCC, 567 F.3d 1215, 1221 (10th Cir.

---

[10]Because the two DOI decisions at issue here must be vacated under this standard of review, the Court need not address Plaintiffs' argument that, in light of the procedural irregularities occurring during the administrative proceedings, the DOI's decisions are not entitled to this presumption of validity or regularity. Plaintiffs argued that the DOI's decisions were not entitled to a "presumption of regularity" because the DOI failed to consult with the Band in a proper manner. In particular, Plaintiffs asserted that, after the NRC issued PFS a license to operate the Skull Valley storage facility, upper level DOI officials took over consideration of the lease and PFS' right-of-way application and succumbed to political pressure against the PFS/Skull Valley project.

[11]Ordinarily a reviewing court will consider only the administrative record that was before the agency at the time it made the challenged decisions.  See 5 U.S.C. § 706; Citizens for Alternatives to Radioactive Dumping v. U.S. Dep't of

(continued...)

2009).

## III.  DISCUSSION

### A.    DOI's denial of PFS' right-of-way application

PFS applied with the BLM for a right-of-way to build and operate its ITF

on federal land.  The Federal Land Policy and Management Act, 43 U.S.C.

§§ 1701-87 ("FLPMA"), authorizes the Secretary of the Interior to grant

rights-of-way over public land for, among other purposes, transportation

facilities.[12]  See id. § 1761(a)(6), (7).  The Secretary manages public land

---

[11](...continued)
Energy, 485 F.3d 1091, 1096 (10th Cir. 2007).  In this case, however, the Court permitted Plaintiffs minimally to supplement the administrative record because Plaintiffs had adequately alleged that the DOI, in making the administrative decisions at issue here, both considered factors left out of the administrative record and ignored other factors that were relevant to its decisions.  After briefing on the merits, Defendants complained that Plaintiffs attached additional materials to their merits brief, materials that Defendants contend were not included in the supplemented administrative record.  In particular, Defendants moved to strike two documents Plaintiffs had attached to their briefs:  Plaintiffs' Exhibit 6, a "Cooperative Law Enforcement Agreement" involving Tooele County, the BIA, and the Skull Valley Band; and Plaintiffs' Exhibit 7, an agreement dated May 23, 2000, between PFS and Tooele County whereby PFS agreed to make payments to the County in order to mitigate some of the impact the storage facility might have on County resources.  In light of Defendants' objection, Plaintiffs withdrew these two exhibits during a hearing before this Court.  Nonetheless, the administrative record contains the Cooperative Law Enforcement Agreement, as well as numerous references to the existence and terms of the agreement between PFS and Tooele County.  Therefore, the Court will consider this information to the extent reflected in the administrative record.  See 5 U.S.C. § 706.

[12]The term right-of-way, for FLPMA purposes, includes "an easement, lease, permit, or license to occupy, use, or traverse public lands."  43 U.S.C. § 1702(f).  PFS sought a right-of-way to build and operate its ITF on just a few acres of public land located between Interstate 80 and the commercial railroad track on which PFS intended to ship the SNF this far.  Many of the DOI's

(continued...)

through the BLM.  See id. § 1731(b).

In its Record of Decision, issued by then Acting Assistant Secretary of the Interior for Land and Minerals Management Chad Calvert ("Calvert ROD"), the DOI denied PFS' application after concluding that the requested right-of-way was contrary to the public interest, see 43 C.F.R. § 2804.26(a)(2).[13]  More specifically, the DOI concluded that the right-of-way was against the public

_____

[12](...continued)
concerns in denying PFS' right-of-way application, however, involved the use of Skull Valley Road to transport the SNF from the ITF to the storage facility located on the reservation.  But PFS did not need to obtain a right-of-way from the DOI to transport the SNF down Skull Valley Road.

[13]43 C.F.R. § 2804.26(a) provides the BLM with six reasons for denying a right-of-way application:

BLM may deny your application if:

(1) The proposed use is inconsistent with the purpose for which BLM manages the public lands described in your application;

(2) The proposed use would not be in the public interest;

(3) You are not qualified to hold a grant;

(4) Issuing the grant would be inconsistent with the Act, other laws, or these or other regulations;

(5) You do not have or cannot demonstrate the technical or financial capability to construct the project or operate facilities within the right-of-way; or

(6) You do not adequately comply with a deficiency notice (see § 2804.25(b) of this subpart) or with any BLM requests for additional information needed to process the application.

interest because "[t]oo many questions remain unanswered to grant the right-of-way at this time. . . . We cannot agree . . . that all appropriate land management questions have been answered at this time."  (Calvert ROD at 10.) In support of that conclusion, the DOI determined that the FEIS both failed to consider a number of relevant questions adequately and also could not have addressed several pertinent new developments occurring after the FEIS was issued.  However, because the DOI was relying upon the information in the FEIS to inform its decision on PFS' right-of-way application, and because it was the DOI's obligation under NEPA to prepare an adequate FEIS, see Kreuger, 513 F.3d at 1177-78, the DOI's decision to deny PFS' right-of-way application because of its own failure to prepare an adequate FEIS was arbitrary and capricious.

In denying PFS' application, the DOI specifically determined that, while the FEIS fully considered how the SNF would be transported to the storage facility, the FEIS had not fully considered the impact that the removal of SNF from the Skull Valley storage facility, and the use of Skull Valley Road to remove the SNF, would have on the environment.  The DOI also suggested that the FEIS was inadequate because it failed to address sufficiently the possibility of a terrorist attack.[14]

---

[14]Because the DOI was obligated to prepare an FEIS that adequately addressed the environmental impacts of the proposed right-of-way, see Kreuger, 513 F.3d at 1178, the DOI's reasoning in the Calvert ROD, that its FEIS did not adequately consider this matter, appears to concede that the DOI did not fulfill its obligations under NEPA.  See Lee, 354 F.3d at 1241 (noting "[a]n agency

(continued...)

The DOI also determined that it had not fully considered new

circumstances occurring after the cooperating agencies issued the FEIS in 2001.

Those new circumstances include the Skull Valley Band's current operation of

the "Tekoi Balefill, a disposal site for bundled waste," which has increased truck

traffic on Skull Valley Road,[15] and Congress' designation of the nearby Cedar

---

[14](...continued)
must obtain and include in the EIS information on reasonably foreseeable significant adverse impacts that are essential to a reasoned choice among alternatives if the costs of obtaining such information are not exorbitant," citing 40 C.F.R. § 1502.22) (quotation omitted).  That, alone, would warrant vacating the DOI's decision to deny PFS' right-of-way application and remanding PFS' right-of-way application in order for the DOI to consider adequately the impacts of the removal of SNF from the proposed Skull Valley storage facility.  See Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1163, 1192 (10th Cir. 2002) (remanding to agency where FEIS was inadequate).

[15]The FEIS, issued in 2001, noted that transporting SNF down Skull Valley Road would have only a "small," or "small to moderate," impact.  Several years after the FEIS was issued, however, in 2004, the Skull Valley Band began operating the Tekoi Balefill.  The balefill is essentially a landfill, but the refuse has been bundled into bales before being transported for disposal.  The DOI, in its Calvert ROD, estimated that the balefill receives 130 to 160 truckloads of bundled refuse from the Salt Lake City area each day.  However, the portion of the balefill DEIS found in this administrative record indicated that if and when PFS begins transporting SNF down Skull Valley Road using the slow-moving heavy-haul trucks, the balefill traffic will use an alternate route during the specific times that the heavy-haul trucks are travelling down Skull Valley Road.

In its Calvert ROD, the DOI indicated that the Balefill's traffic on Skull Valley Road causes two problems that the agency has not fully considered.  First, the DOI did not consider the impact of this increased traffic on Skull Valley Road.  Second, the ROD noted, inconclusively, that members of the public commented that this increased traffic on Skull Valley Road might result in the SNF staying longer at the ITF than originally intended.  Plaintiffs justifiably respond that there is no evidence in the record to support the DOI's concern that the SNF would be delayed at the ITF so long that it would essentially be stored there.  In any event, the FEIS already previously considered and rejected the general argument that SNF waiting at the ITF to be transported to the

(continued...)

Mountain Wilderness area, which requires further study both to determine whether the ITF will affect that area and, because the wilderness area eliminated the FEIS' preferred alternative–shipping the SNF to the storage facility via the new rail spur–to give a closer look at the ITF transportation alternative than the FEIS originally gave it.[16]

Based on these determinations–that the FEIS failed to consider adequately the removal of the SNF from the PFS storage facility and the possibility of terrorist attacks, and because the FEIS could not have considered

---

[15](...continued)
storage facility would be "stored" there.

[16]An FEIS must include a discussion of alternatives to the proposed action; that is, the FEIS must "evaluate[] the environmental impacts of the proposed action, as compared with the impact of alternative course of action." Fuel Safe Washington, 389 F.3d at 1323; see also 42 U.S.C. § 4332(2)(C)(iii). In fact, "[t]he consideration of alternatives to a proposed action is 'the heart of the environmental impact statement.'" Lee, 354 F.3d at 1238 (quoting 40 C.F.R. § 1502.14). Therefore, "Council on Environmental Quality (CEQ) regulations implementing NEPA require agencies to 'rigorously explore and objectively evaluate all reasonable alternatives,'" and not just the alternative the FEIS preferred. Id. (quoting 40 C.F.R. § 1502.14) (alteration, emphasis omitted); see also 43 C.F.R. § 46.425(c) (DOI regulations pertaining to public lands requiring agency to "rigorously explore" alternatives); see Colo. Wild, 435 F.3d at 1209 (noting CEQ regulations bind every federal agency). So the DOI's reasoning in this regard, that here the FEIS did not adequately consider the transportation alternative involving use of the ITF, again calls into question whether the DOI initially fulfilled its NEPA obligations.

Before this court, Defendants further assert that the harms recognized in the FEIS associated with using the ITF–greater radiation exposure of PFS' employees and disruption of traffic on Skull Valley Road–justify denying PFS' right-of-way application outright. But the DOI, in its Calvert ROD, did not rely on that reasoning to deny PFS' right-of-way application, and this Court's review is limited to the reasons proffered by the DOI in its challenged decision, see Colo. Wild, 435 F.3d at 1213.

the now-operating Tekoi balefill and the newly-designated Cedar Mountain

Wilderness Area–the DOI denied PFS' right-of-way application.  The Court does

not question that the DOI needs to consider fully these matters before ruling on

PFS' right-of-way application.  But here, the DOI <u>denied</u> that application

because its own FEIS was not adequate.  That was arbitrary and capricious.

<u>See</u> <u>Kreuger</u>, 513 F.3d at 1177-78 (quotation omitted) (noting that NEPA places

the burden of conducting an adequate study of the environmental impacts of a

proposed action on the agency and "prohibits uninformed . . . agency action").

This is particularly true where, as here, the DOI, acting through the BLM,

has readily available mechanisms which it could have invoked to obtain the

information it found lacking in the FEIS.  CEQ regulations require an

agency–here the DOI–to prepare a supplemental environmental impact

statement ("SEIS") when "[t]here are significant new circumstances or

information relevant to environmental concerns and bearing on the proposed

action or its impacts"; CEQ regulations further provide that the agency–here the

DOI–"[m]ay also prepare supplements when the agency determines that the

purposes of [NEPA] will be furthered by doing so."[17]  43 C.F.R.

§ 1502.9(c)(1)(ii), (2).  <u>See</u> <u>Ecology Ctr., Inc. V. U,S, Forest Serv.</u>, 451 F.3d

_____

[17]NEPA created the Council on Environmental Quality ("CEQ"), <u>see</u> 42
U.S.C. § 4342, and charged that agency with administering NEPA and
promulgating regulations related to NEPA that are binding on all federal
agencies, 40 C.F.R. Pts. 1500-08.  <u>See</u> <u>Colo. Wild</u>, 435 F.3d at 1208-09.  In
addition to those CEQ regulations, "[e]very federal agency then drafts its own
administrative regulations to implement and supplement the CEQ regulations."
<u>Id,</u> at 1209; <u>see also</u> 40 C.F.R. §§ 1505.1, 1507.3.

1183, 1189 (10th Cir. 2006) (noting agency prepared SEIS after deeming EIS incomplete); see also Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 371 (1989) (noting NEPA ensures agency will not act on incomplete information).

Beyond the NEPA process, however, the DOI, through the BLM, "may require [a right-of-way applicant] to submit additional information at any time while processing the application," and can "[t]ake any other action necessary to fully evaluate and decide whether to approve or deny [the] application."  43 C.F.R. § 2804.25(b), (d)(6); see also 43 U.S.C. § 1761(b); 43 C.F.R. § 2884.11(c)(8), (11).  If the applicant fails to provide information requested by the BLM, then the BLM or the DOI can deny the application on that basis.  See 43 C.F.R. § 2804.26(a)(6).  But there is no indication here that either the BLM or the DOI ever requested that PFS provide the additional information the DOI deemed necessary in its Calvert ROD.

Thus, the DOI had an obligation to prepare an adequate FEIS and had available to it a number of mechanisms to obtain the information it determined it needed in order to consider thoroughly PFS' right-of-way application.  Moreover, the information the DOI found the FEIS lacked generally appears to be readily obtainable.  Cf. 40 C.F.R. 1502.22(a) (noting that, "[i]f the incomplete information relevant to reasonably foreseeable significant impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the" EIS).  Because the DOI did not invoke any of these available mechanisms to obtain the additional information it deemed necessary for a thorough consideration of PFS'

18

right-of-way application, but instead simply denied PFS' right-of-way application

because there were too many questions left unanswered, the DOI's decision

was arbitrary and capricious, and an abuse of discretion.[18]  See Colo. Wild, 435

F.3d at 1213 (requiring, under arbitrary-and-capricious review, "reasoned basis

for agency action").

Finally, the DOI denied PFS' right-of-way after noting that PFS would not

be eligible for public funding.  However, because the PFS/Skull Valley project

was not premised on any public funding, this point does not support DOI's

decision to deny the right-of-way.

For these reasons, the DOI's decision to deny PFS' right-of-way

application was arbitrary and capricious, and an abuse of discretion.[19]  On

_____

[18]Plaintiffs suggest that the DOI was required to prepare an SEIS.
Defendants counter with several arguments why they believe Plaintiffs cannot
assert such a claim under NEPA.  Although Plaintiffs invoke NEPA in their
arguments to this Court, they do so only in response to the DOI's decision to
deny PFS' right-of-way application after determining that the DOI's own FEIS
was inadequate.  Plaintiffs certainly have standing, see 5 U.S.C. § 702, and can
invoke NEPA to challenge the denial of PFS' right-of-way application on that
basis.

[19]Defendants further assert that the DOI denied PFS' right-of-way
application, despite not having adequate information to consider that application
fully, because the Skull Valley Band insisted on a quick decision.  But this
Court's review is limited to the reasons given in the agency's decision, see
Colo. Wild, 435 F.3d at 1213, and the DOI, in its Calvert ROD, did not mention
the need for a quick decision to justify its denial of PFS' right-of-way application.

To the extent Plaintiffs asserted a separate claim in their amended
complaint alleging the DOI's Calvert ROD violated the Band's 1863 Treaty with
the United States, the Court deems Plaintiffs to have waived that separate claim
by not addressing and developing it in their briefs.  See D.L. v. Unified Sch.

(continued...)

remand, the DOI can, of course, consider additional evidence concerning the

matters the Calvert ROD deemed the FEIS to have given insufficient

consideration, as well as the more recent matters that the FEIS could not have

considered.

## B.    DOI's disapproval of Plaintiffs' lease

The Indian Long-Term Leasing Act ("ILTLA") required PFS and the Skull

Valley Band to obtain the Secretary of the Interior's approval of their lease:

"[a]ny restricted Indian lands, whether tribally, or individually owned, may be

leased by the Indian owners, with the approval of the Secretary of the Interior,

for . . . business purposes."  25 U.S.C. § 415(a).  However,

> [p]rior to approval of any lease or extension of an existing lease
> pursuant to this section, the Secretary of the Interior shall first satisfy
> himself that adequate consideration has been given to the relationship
> between the use of the leased lands and the use of neighboring lands;
> the height, quality, and safety of any structures or other facilities to be
> constructed on such lands; the availability of police and fire protection
> and other services; the availability of judicial forums for all criminal
> and civil causes arising on the leased lands; and the effect on the
> environment of the uses to which the leased lands will be subject.

Id.  Applying § 415(a), the DOI, in a Record on Decision signed by Associate

Deputy Secretary of the Interior James Cason ("Cason ROD"), disapproved

Plaintiffs' lease.  Plaintiffs contend that that decision was contrary to law, as

well as arbitrary and capricious, and an abuse of discretion.

### 1.    The Cason ROD was "not in accordance with law"

Plaintiffs first assert that the DOI decision reached in the Cason ROD was

---

[19](...continued)
Dist. No. 497, 596 F.3d 768, 775 (10th Cir. 2010) (per curiam).

contrary to 25 C.F.R. § 162.107(a), which provides that, "[i]n reviewing a negotiated lease for approval, [the agency] will defer to the landowners' determination that the lease is in their best interest, to the maximum extent possible."[20]   Under the circumstances presented here, the Court agrees.

_____

[20]The ILTLA authorized the DOI to promulgate regulations pertaining to leases involving Indian land. See 25 U.S.C. § 415(a) ("[A]ll leases and renewals shall be made under such terms and regulations as may be prescribed by the Secretary of the Interior."); see also Red Mountain Mach. Co. v. Grace Inv. Co., 29 F.3d 1408, 1410-11 (9th Cir. 1994).  In 2001, the DOI revised its lease regulations, see 25 C.F.R. Pt. 162, in order, among other things, to "[i]dentify the conditions and authorities under which certain interests in Indian land and Government land may be leased," 25 C.F.R. § 162.100(a)(1).  See 66 Fed. Reg. 7068-01 (Jan. 22, 2001).  It was at this time that the DOI added 25 C.F.R. § 162.107.

By that time, however, the BIA had already conditionally approved Plaintiffs' Lease.  Nonetheless, the DOI subsequently disavowed that conditional approval when it ultimately disapproved the Lease in September 2006, five years after 25 C.F.R. § 162.107 went into effect.  Under these circumstances, the parties agree that 25 C.F.R. § 162.107 applies here.  That regulation, then, provides in full:

(a) We will assist Indian landowners in leasing their land, either through negotiations or advertisement.  In reviewing a negotiated lease for approval, we will defer to the landowners' determination that the lease is in their best interest, to the maximum extent possible.  In granting a lease on the landowners' behalf, we will obtain a fair annual rental and attempt to ensure (through proper notice) that the use of the land is consistent with the landowners' wishes.  We will also recognize the rights of Indian landowners to use their own land, so long as their Indian co-owners are in agreement and the value of the land is preserved.

(b) We will recognize the governing authority of the tribe having jurisdiction over the land to be leased, preparing and advertising leases in accordance with applicable tribal laws and policies.  We will promote tribal control and self-determination over tribal land and other land under the tribe's jurisdiction, through contracts and self-governance compacts entered into under the Indian

(continued...)

The DOI, in its Cason ROD, did not even mention 25 C.F.R. § 162.107(a) or its requirement that the DOI defer, "to the maximum extent possible," to the Skull Valley Band's determination that its lease with PFS was in the Band's best interest.[21]  Nor did the DOI employ § 162.107(a)'s language or otherwise discuss why it was rejecting the Band's determination that its lease with PFS was in its best interest.  To the contrary, the DOI focused only on its role as trustee for the Band, concluding that it had "weigh[ed] the benefits to the Band against the significant uncertainties and other factors" and "conclude[d] that it is not consistent with the conduct expected of a prudent trustee to approve a proposed lease that promotes storing SNF on the reservation."[22]  (Cason ROD at 19.)

_____

[20](...continued)
Self-Determination and Education Assistance Act, as amended, 25 U.S.C. § 450f et seq.

25 C.F.R. § 162.107 (emphasis added).  The regulation's use of the word "we" refers to the BIA, to which the Secretary has delegated his lease-approval authority, see Garreaux v. United States, 544 F. Supp.2d 885, 893 (D. S.D. 2008).

[21]The DOI, in its Cason ROD, only makes two passing, non-substantive references to 25 C.F.R. Part 162 generally.  (Cason ROD at 12 n.10, 18.)

[22]The DOI did acknowledge the Skull Valley Band's interest in having its lease with PFS approved, but the DOI did so only with a focus on its role as trustee for the Band:

As trustee-delegate, the Secretary has the complex task of weighing the long-term viability of the Skull Valley Goshute reservation as a homeland for the Band (and the implications for preservation of Tribal culture and life) against the benefits and risks from economic development activities proposed for property held in trust by the United States for the benefit of the Band. . . .

(continued...)

22

Furthermore, all of the cases on which the DOI relied, in the Cason ROD, to set forth the standard the DOI was applying to consider Plaintiffs' lease predate 25 C.F.R. § 162.107.

Moreover, the manner in which the DOI considered Plaintiffs' lease further indicates that the DOI did not comply with 25 C.F.R. § 162.107(a)'s mandate to "defer to the landowners' determination that the lease is in their best interest, to the maximum extent possible."  After the NRC, in February 2006, issued PFS a license to operate the storage facility on the Skull Valley reservation, the Skull Valley Band wrote to and met with DOI officials, urging the DOI to approve

---

[22](...continued)
. . . .

. . . We see our primary duty as trustee-delegate, under the law regarding this and other proposed leases, to be the protection of the trust res as a future homeland and productive land base for the Band through the prudent exercise of informed discretion after considering all the relevant factors.

We are cognizant of and have carefully considered the economic impact to the Band in making this decision.  We are aware of the income the proposed lease would provide the Band, and that economic benefit has weighed heavily in our consideration of the proposed lease.  Upon weighing the benefits to the Band against the significant uncertainties and other factors discussed below, we conclude that it is not consistent with the conduct expected of a prudent trustee to approve a proposed lease that promotes storing SNF on the reservation.  In reaching this conclusion, we emphasize that the decision to disapprove the proposed lease and choose the [FEIS's] no action alternative in this ROD does not foreclose other economic development activities that the Band could pursue.

(Cason ROD at 18-19.)

23

Plaintiffs' lease.[23]  In at least three letters sent to the DOI during this time frame,

the Skull Valley Band indicated that, if the DOI still had concerns about

approving the lease or if there were issues the DOI still needed to resolve

regarding the lease, the Band would be happy to address these issues and

concerns.  The DOI, however, never responded to the Band's offers, nor did the

DOI ever seek any additional information.[24]  Yet, similar to its decision in the

Calvert ROD, the DOI in its Cason ROD disapproved Plaintiffs' lease in part

because the DOI concluded that it did not have sufficient information about the

25 U.S.C. § 415(a) factors relevant to the approval or disapproval of Plaintiffs'

lease.  These circumstances, then, further indicate that the DOI, in disapproving

---

[23]When the BIA originally approved Plaintiffs' lease, in 1997 (an approval
the agency later disavowed), the agency conditioned its approval on the
occurrence of several things, including the completion of the NEPA analysis,
Plaintiffs' incorporation of any mitigation efforts the FEIS suggested, and the
NRC's issuance of a license.  When the NRC issued PFS a license in February
2006, all of these conditions had been met.  It was in light of that that the Skull
Valley Band urged the DOI finally to approve Plaintiffs' lease.  It was not until
the Cason ROD, issued in September 2006, that the DOI withdrew its earlier
conditional approval of the lease, at the same time DOI finally disapproved
Plaintiffs' lease.  Plaintiffs are challenging the final disapproval of the lease.

[24]Plaintiffs further point out that sections of the DOI's "Departmental
Manual" require the agency to "consult with tribes on a
government-to-government basis whenever plans or actions affect tribal trust
resources, trust assets or tribal health and safety." (Plaintiffs Br. 18, ex. 5 at 1.)
The manual also provides that, for any proposed agency action that might affect
tribal trust resources, the DOI must "[c]learly state the rationale for the
recommended decision" and "[e]xplain how the decision will be consistent with
the Department's trust responsibility." (Id. at 2.)  Further, the Manual requires
that "[e]ach bureau and office within the [DOI] be open and candid with tribal
government(s) during the consultations so that the affected tribe(s) may fully
evaluate the potential impact of the proposal on trust resources and the affected
bureau(s) or office(s), as trustee, may fully incorporate tribal views in its
decision-making processes." (Id.)

24

Plaintiffs' lease, did not defer to the Band's determination of its best interests, to the maximum extent possible.  In reaching this conclusion, the Court need not specify exactly what efforts the DOI should have undertaken to fulfill its obligation under 25 C.F.R. § 162.107(a) because here the DOI did not undertake any such effort.  At a minimum, the DOI should have at least responded to the Band's offer to address any concerns the DOI had about the lease before disapproving that lease.  For these reasons, the Court vacates the DOI's decision to disapprove Plaintiffs' lease and remands the lease to the DOI for its further consideration in light of 25 C.F.R. § 162.107(a).

In doing so, the Court notes that this regulation clearly does <u>not</u> mandate that the agency simply acquiesce to the Indian landowner's wishes, because the regulation qualifies the DOI's deference to the Band's own determination of its best interest with the phrase "to the maximum extent possible."  Further, this regulation implements 25 U.S.C. § 415(a), which still requires the Secretary, in deciding whether or not to approve a lease of Indian land, to consider a number of factors beyond just the Indian landowner's wishes.

Nevertheless, deferring to the Indian landowners' determination as to what is in their best interest is consistent with 25 U.S.C. § 415(a), which is "intended to protect Native American interests." <u>Nulankeyutmonen Nkihtaqmikon v. Impson</u>, 503 F.3d 18, 30 (1st Cir. 2007) ("<u>Impson</u>") (quotation, alteration omitted); <u>see also</u> <u>Bullcreek v. U.S. Dep't of Interior</u>, 426 F. Supp.2d 1221, 1230 (D. Utah 2006) (noting § 415(a) "protects the ability of owners of restricted Indian lands to lease those lands"); <u>Utah v. U.S. Dep't of Interior</u>, 45 F. Supp.2d

25

1279, 1283 (D. Utah 1999) (noting that "§ 415(a) is primarily concerned with protecting Native American interests by insuring that their land transactions with third parties are advantageous").  And courts have

> note[d] that the long-standing objective spurring passage of the Long-Term Leasing Act was to encourage and enable Indian landowners to handle their own affairs without assistance from the federal government.  It is consistent with this basic objective that the duties of the government be interpreted minimally, ensuring that Indians receive the full responsibility of managing their own affairs.

Brown v. United States, 42 Fed. Cl. 538, 553 (Fed. Cl. 1998) (addressing United States' role in ensuring that lessee complies with terms of approved lease; further noting that the Act provides the government with a "limited . . . caretaker role" of approving the lease, after "ensur[ing] that the lease, being of long duration, is not harmful to the Indian[s'] long-term interests"), aff'd, 195 F.3d 1334 (Fed. Cir. 1999).  Similarly, the DOI promulgated 25 C.F.R. § 162.107, as well as other regulations in 25 C.F.R. Pt. 162, in part to "provide for more pervasive deference to tribal law and tribal self-determination."  66 Fed. Reg. 7068-01, 7080; see also Siemon v. Rocky Mountain Reg'l Dir., 48 IBIA 249, 254 (Feb. 5, 2009) ("BIA's decision whether to approve a lease is based on the best interest of the Tribe," citing e.g., 25 C.F.R. § 162.107); Anderson v. Acting Sw. Reg'l Dir., 44 IBIA 218, 227 (Apr. 9, 2007) (noting that, "in exercising its trust obligation, BIA is entitled to give considerable deference to the Pueblo's judgment of what is in its own interest," citing 25 C.F.R. § 162.107(a)).[25]

---

[25]The Court rejects Plaintiffs' assertion that 25 C.F.R. § 162.107 signals that the DOI no longer acts as a trustee for the Skull Valley Band.  Prior to the

(continued...)

### 2.     The Cason ROD was arbitrary and capricious, and an abuse of discretion

Although the DOI's failure to comply with 25 C.F.R. § 162.107(a) requires

this Court to remand Plaintiffs' lease to the agency for further consideration,

Plaintiffs also challenge a number of the grounds on which the Cason ROD

disapproved their lease as arbitrary and capricious, or an abuse of discretion.

The Court will also address those arguments here because doing so may better

inform the agency's consideration of the lease on remand.

### a.     It was arbitrary and capricious for the ROD to justify disapproving the lease because the record before the

---

[25](...continued)

BIA's promulgating this regulation, courts recognized that the DOI, in deciding whether to approve a lease of Indian land under 25 U.S.C. § 415, was acting as a trustee for, or in a fiduciary capacity toward, the Indian landowner.  See Brown v. United States, 86 F.3d 1554, 1563 (Fed. Cir. 1996); Utah, 45 F. Supp.2d at 1283.  Even after the DOI promulgated 25 C.F.R. § 162.107(a) in 2001, courts have continued to recognize a fiduciary or trust relationship.  See Oenga v. United States, 83 Fed. Cl. 594, 621-22 (Fed. Cl. 2008) (citing Brown, 86 F.3d at 1563); Garreaux, 544 F. Supp.2d at 896 (noting BIA owes fiduciary duty to landowner); Saguaro Chevrolet, Inc. v. United States, 77 Fed. Cl. 572, 580 (Fed. Cl. 2007) ("The general purpose of the BIA regulations in the area of leasing Indian land, as indicated in recent revisions to the regulations, is to 'further fulfill the Secretary's fiduciary responsibility to federally-recognized tribes and individual Indians," quoting 66 Fed. Reg. 7068); see also United States v. Torlaw Realty, Inc., 348 Fed. App'x 213, 218-19 (9th Cir. Sept. 2, 2009) (unpublished) (noting that 25 U.S.C. § 415 "places the Government, in its capacity as landowner and trustee, in the paternalistic position of sanctioning only those land uses which strike an appropriate balance between economic development for the allottees and the impact of that development on the environmental health and safety of the allotment property and surrounding community," citing only pre-2001 cases for support; but noting that Government may have given short shrift in that case to its role of representing Indian allottees' economic interests).  That is consistent with the language of both 25 U.S.C. § 415(a) and 25 C.F.R. § 162.107(a) which requires or at least permits the DOI to consider other factors, beyond the Indian landowners' determination of their best interest, in deciding whether or not to approve a lease.

**agency was deficient**

25 U.S.C. § 415(a) directs, in part, that "[p]rior to the approval of any lease . . . , the Secretary of the Interior shall first satisfy himself that adequate consideration has been given to . . . the effect on the environment of the uses to which the leased lands will be subject."  In addition, NEPA requires the DOI to consider the environmental impacts of the proposed lease, see 42 U.S.C. § 4332(2)(C); Davis, 469 F.2d at 596-98, and "NEPA's scope of review significantly exceeds that required by § 415(a)," Utah, 210 F.3d at 1196.  In this case, the DOI expressly considered the environmental impacts of the proposed Skull Valley storage facility through the FEIS.

Like its decision in the Calvert ROD, the DOI, in the Cason ROD, disapproved Plaintiffs' lease, in part, after concluding that its own FEIS inadequately addressed a possible terrorist attack and failed to consider fully the process by which the SNF would be removed from the Skull Valley facility after the NRC license expires and the lease ends.  And like the Calvert ROD, the DOI concluded in the Cason ROD that the DOI had not adequately considered how the Tekoi Balefill and the designation of the Cedar Mountain Wilderness Area would impact, and be impacted by, the PFS/Skull Valley storage facility.  For the same reasons discussed above in vacating the Calvert ROD, see supra § III.A, the Court also concludes that the DOI's reliance in the Cason ROD on these grounds to disapprove Plaintiffs' lease was arbitrary and capricious, and an

abuse of discretion.[26]  See Impson, 503 F.3d at 29 ("The federal government's duty under the Leasing Act [25 U.S.C. § 415(a)] . . . is to ensure that the parties to a lease of Indian land have given adequate consideration to the impact of the lease on, inter alia, neighboring lands and the environment.")  This is all the more true here, where, as discussed above, the Government has a trust relationship with the Skull Valley Band and the DOI's own policies dictate that the agency should consult with the tribe.[27]  On remand, the agency can, of course, consider evidence presented in these matters.

> **b.    It was arbitrary and capricious for the DOI to disapprove Plaintiffs' lease for reasons contradicted or unsupported by the record**

An agency's decision will be arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency."  Morris, 598 F.3d at 690 (quotation omitted).  Plaintiffs contend that the DOI disapproved Plaintiffs' lease for several reasons that were contradicted or unsupported by evidence in the administrative record.  Again, the Court agrees.

> **(1)    Police protection**

---

[26]The parties interpret the DOI's decision in the Cason ROD to conclude further that the DOI did not adequately consider the police protection available for the project, the BIA's ability to enforce Plaintiffs' lease, and the decommissioning process.  To the extent that the DOI concluded in its Cason ROD that the DOI failed to consider these questions adequately, the ROD would also be arbitrary, capricious, and an abuse of discretion, for the same reasons stated above.

[27]For the same reasons discussed earlier, the Court rejects Defendants assertion that Plaintiffs cannot assert a NEPA claim challenging the DOI's decision in the Cason ROD.

In addition to considering the environmental impacts of the proposed lease, 25 U.S.C. § 415(a) requires the Secretary to "satisfy himself that adequate consideration has been given to the relationship between the use of the leased lands and use of neighboring lands . . . [and] the availability of police and fire protection and other services."  The DOI noted, in the Cason ROD, that while the NRC, in its licensing proceeding, gave "exhaustive consideration to <u>security</u> at the proposed" storage facility, the DOI instead "is responsible for <u>law enforcement</u> on the Goshute Reservation and throughout all of Indian Country." (Cason ROD at 24.)  The DOI further concluded that neither the BIA, the Skull Valley Band, nor the Tooele County Sheriff's office had the "resources to provide adequate law enforcement support for the proposed" PFS/Skull Valley project.  (<u>Id.</u>)  The DOI specifically noted that BIA "managers estimate that seven full-time law enforcement officers and two support staff would be required to adequately provide law enforcement services to the Reservation if the [PFS storage project] is built."  (<u>Id.</u> at 25.)  Further, the DOI indicated that the PFS/Skull Valley project would require "round-the-clock [law] enforcement services . . . due to additional traffic and other activities on the Reservation as a result of the proposed" storage facility.  (<u>Id.</u>)

Defendants, however, fail to point out, and the Court has not found, anything in the administrative record to support the DOI's determination that there will be an increased need for police protection on the reservation (apart from the storage facility's own security), nor that there is a specific need for seven additional full-time BIA law enforcement officers or for round-the-clock law

30

enforcement.[28]  To the contrary, the FEIS indicated instead that there would be

no need to increase police protection on the reservation.  Therefore, because

there was nothing in the administrative record to support the DOI's

determination that there is a need for additional police protection, the agency's

decision to disapprove the lease on this basis was arbitrary and capricious.[29]

See Morris, 598 F.3d at 690.  If evidence of such a need is presented to the DOI

on remand, however, the agency can of course consider it.

### (2)    DOI's lack of specialized monitoring resources

After approving a lease of Indian land, the DOI must then enforce the

lease and insure that the tenant abides by its terms.  See 25 C.F.R. §§ 162.108,

162.615-23.  In disapproving Plaintiffs' lease, the DOI appears to identify two

---

[28]The only thing Defendants point to is the FEIS' note that there may be a "small" increase in traffic on Skull Valley Road and a letter submitted to the DOI from a neighboring tribe concerning its worry that there would be a need for additional police officers.  That concern, without further support, is insufficient to support this reason the DOI proffered for disapproving the lease.

[29]Plaintiffs point out that, if DOI officials had brought their concerns about the need for increased law enforcement to Plaintiffs' attention, Plaintiffs could have addressed those concerns to the DOI's satisfaction.  Plaintiffs further indicate that the Skull Valley Band previously had a contract with the Tooele County Sheriff's Department for the provision of police protection, and they suggest that they could seek to negotiate such an agreement again in the future.  Further, Plaintiffs point to a contract that PFS entered with Tooele County whereby PFS agreed to pay the County approximately $91 million over the life of the project in order to ameliorate any impact on the County's services caused by the project.  Plaintiffs sought to attach as exhibits to their brief both the prior contract between the Skull Valley Band and Tooele County, whereby Tooele County agreed to provide law enforcement on the reservation, and the $91 million contract between PFS and the County.  In light of Defendants' objection, however, Plaintiffs withdrew those exhibits.  As previously mentioned, all of this information is, in any event, already part of the administrative record.

different problems that would interfere with its ability to enforce the terms of that agreement on the Skull Valley Band's behalf.

(a)     The need for "highly technical" expertise

The DOI first determined that the "highly technical nature of the proposed [storage project] effectively eliminates the Secretary's ability to inspect the tenant's activities and enforce the lease." (Cason ROD at 25.)  In the same vein, the DOI further noted that "[t]he Secretary controls no independent specialized technical resources of the type required to assess compliance of so specialized a tenant as PFS.  The BIA employs no nuclear scientists or technicians nor other specialty skills that would be required to adequately monitor the lease." (Id. at 26.)

The terms of the lease, however, are detailed, straightforward, and non-technical, requiring PFS to build the storage facility, provide security and insurance for it, make specific rental payments to the Band at particular times, and give Band members preference in PFS' hiring.  None of these lease terms seem to require a nuclear scientist to enforce.  The lease, of course, does concern a technical project, but it is the NRC that has licensed the storage facility and will oversee the more technical aspects of its operation and decommissioning.

Even assuming that the DOI would require some technical assistance in order to enforce the lease terms, however, the DOI does not further explain why the agency could not obtain such technical assistance.  The administrative record indicates, for example, that the DOI was aided throughout the NEPA

32

process by an independent contractor that provided the agency with technical

assistance.  Without further explanation, then, the DOI's disapproval of the

lease because of the DOI's inability to enforce the "highly technical" nature of

the lease was not supported by the administrative record and was, thus,

arbitrary and capricious.  See Morris, 598 F.3d at 690.

### (b)    Permanent structures

The DOI also determined that it could not enforce the terms of Plaintiffs'

lease because any order the DOI issued to PFS to vacate the reservation

> would have no practical effect because of the extensive infrastructure
> and investment at the facility, and the logistics, expense, and national
> consequences of the displacement of SNF stored there.  The [Skull
> Valley storage facility], once constructed, has qualities of permanence
> that render the trustee-delegate's ultimate means of protecting the
> Indian landowner unworkable, and it is not prudent to approve a lease
> that has this consequence.

(Cason ROD at 26.)

To the extent the DOI was concerned that it would not be possible to

remove the "extensive" infrastructure of the storage facility after an "extensive"

investment in it, the lease as well as the NRC license specifically require PFS to

dismantle the storage facility entirely and decommission the site at the end of

the lease term and the expiration of the license, or earlier if the lease terminates

sooner, even in light of and notwithstanding the significant investment initially

involved in building the storage facility.[30]  And there is no evidence in the

---

[30]A lease under the ILTLA involving an "extensive infrastructure and
investment" is not surprising.  Prior to Congress enacting that statute, Indians,
with the Secretary of the Interior's approval, could only lease their land for short

(continued...)

administrative record that PFS could not physically dismantle the site and

decommission the facility.[31]  If presented to it, the DOI can consider any such

evidence on remand.

> **(3)    When the stored SNF might leave the reservation**

Building on the previous contention, the DOI also disapproved Plaintiffs'

lease because "[t]he Secretary cannot ascertain when SNF might leave trust

land."  (Cason ROD at 26.)  The DOI's specific concern, and one expressed by a

---

[30](...continued)
periods of time, usually no more than five or ten years.  See Reid Peyton
Chambers & Monroe E. Price, Regulating Sovereignty: Secretarial Discretion
and the Leasing of Indian Lands, 26 Stan. L. Rev. 1061, 1072-74 (May 1974).
In enacting the ILTLA in 1955, Congress instead provided for leases that
generally can last for twenty-five years, with an option to renew the lease for an
additional twenty-five years.  See 25 U.S.C. § 415(a).  Congress' "major
purpose" in enacting the ILTLA "was to increase Indian income by opening
Indian land to market forces and encouraging long-term leasing for commercial
purposes.  Congress was concerned that [previously] restricted lease periods
had discouraged lessees from obtaining long-term construction financing and
had thus foreclosed uses of land which required substantial investment."
Chambers & Reid, supra, at 1074; see also Red Mountain Mach., 29 F.3d at
1412 (noting "Congress first authorized the long-term leasing of Indian lands in
order to bring Indians much needed income that they could not receive under
short-term leases"); Yavapai-Prescott Indian Tribe v. Watt, 707 F.2d 1072, 1074
(9th Cir. 1983) (noting that "Congress adopted section 415 to encourage
long-term commercial leases of Indian land and thereby to enhance profitable
development").  In light of this purpose of the ILTLA, the fact that the lease at
issue here involved construction of permanent structures, an extensive
infrastructure and significant investment is not sufficient, alone, to justify
disapproving the lease.

[31]Defendants also argue that the "[t]he record did not discuss a plan for
decommissioning the facility, . . . the FEIS only noted that a plan would have to
be prepared and submitted at least twelve months" before decommissioning was
to begin.  (Defendants Br. at 26.)  However, the DOI, in its Cason ROD, did not
rely on these specific concerns to disapprove the lease.  Therefore, this Court
cannot consider them here now.  See Colo. Wild, 435 F.3d at 1213.

number of individuals and entities in Utah and elsewhere, is that the temporary

storage facility in Skull Valley will become, de facto, a permanent storage site,

particularly in light of the difficulty that the United States has had in establishing

a permanent, DOE-operated storage facility.

There is, however, a plan in place to remove the stored SNF from the

Skull Valley facility when the NRC license expires and the lease ends.  That

plan binds PFS, and calls for the removal of the stored SNF by its owners, those

utilities that generated it, whether or not there is a DOE-operated permanent

storage facility available at that time.  Defendants fail to point to any evidence in

the record indicating that this decommissioning plan is unworkable.  Without

such evidence, the DOI was arbitrary and capricious for disapproving the lease

on these grounds.  If presented with such evidence on remand, however, the

agency can consider it.

## IV.  CONCLUSION

For the foregoing reasons, the Court VACATES both the DOI's Calvert

and its Cason RODs and REMANDS PFS' right-of-way application and Plaintiffs'

lease to the DOI for further consideration consistent with this decision.  The

Court rejects Plaintiffs' request, made for the first time in their supplemental

brief, that the Court retain jurisdiction during the administrative proceedings

following remand.  Therefore, because this order resolves all matters before the

Court and because the Court does not intend to retain jurisdiction after remand,

the Court will direct the clerk of the court to enter final judgment.  See Fed. R.

Civ. P. 58.  The Court is cognizant of Plaintiffs' request for attorneys' fees and

35

will consider that request if reasserted in an appropriate post-judgment motion,
<u>see</u> 28 U.S.C. § 2412(d)(1)(B).


Dated:   <u>July 26, 2010</u>


                  By the Court:


                  */s/ David M. Ebel*
                  _____
                  UNITED STATES CIRCUIT JUDGE